Thomas N. Abbott (OSB 193043)
TROUTMAN PEPPER HAMILTON SANDERS LLP
100 S.W. Main St, Suite 1000
Portland, OR 97204
(503) 290-2322
Thomas.Abbott@troutman.com

James Kim (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
(212) 704-6000
James.Kim@troutman.com

Jason D. Evans (*pro hac vice* forthcoming)
Anais M. Jaccard (*pro hac vice* forthcoming)
Daniel J. Prichard (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
301 S. College St., 33rd Floor
Charlotte, NC 28202
(704) 916-1502
Jason.Evans@troutman.com
Anais.Jaccard@troutman.com
Daniel.Prichard@troutman.com

Caleb N. Rosenberg (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 274-1946
Caleb.Rosenberg@troutman.com

*Counsel for Plaintiffs Wheels Financial Group, LLC
and WFG Purchaser, LLC*

COMPLAINT – 1

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| WHEELS FINANCIAL GROUP, LLC, d/b/a LoanMart and WFG PURCHASER, LLC,<br><br>             Plaintiffs,<br><br>    v.<br><br>ANDREW R STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services, TK KEEN, in his official capacity as Administrator of the Oregon Department of Consumer and Business Services, Division of Financial Regulation, and DOROTHY BEAN, in her official capacity as Chief of Enforcement of the Oregon Department of Consumer and Business Services, Division of Financial Regulation,<br><br>             Defendants. | Case No. 3:24-cv-1543<br><br>**COMPLAINT**<br>**For Declaratory and Injunctive Relief** |

Plaintiff Wheels Financial Group, LLC, d/b/a LoanMart ("LoanMart"), and Plaintiff WFG Purchaser, LLC ("WFG") (together, "Plaintiffs") file this complaint against Defendant TK Keen, in his official capacity as the Administrator of the Oregon Department of Consumer and Business Services, Division of Financial Regulation, Defendant Andrew R. Stolfi, in his official capacity as Director of the Oregon Department of Consumer and Business Services, and Defendant Dorothy Bean, in her official capacity as Chief of Enforcement of the Oregon Department of Consumer and Business Services, Division of Financial Regulation (together, the "Defendants") pursuant to 28 U.S.C. § 2201, 28 U.S.C. § 2202, and Fed. R. Civ. P. 3.

## NATURE OF THE ACTION

1.      This lawsuit challenges the Oregon Department of Consumer and Business

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

Services ("DCBA"), Division of Financial Regulation's ("DFR") threatened enforcement action that would purportedly void loans originated by Capital Community Bank (the "Bank") pursuant to the Bank's authority to make loans, charge interest, and sell loans under the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. §§ 1811 *et seq*., and the Bank's Utah charter.

2.      The Bank is a Federal Deposit Insurance Corporation ("FDIC")-insured, Utah-chartered state bank with its principal place of business in Utah and branches located exclusively in Utah.  LoanMart is a third-party service provider for certain loans the Bank originated to Oregon borrowers ("Oregon Bank Loans").  WFG is an asset-holding affiliate of LoanMart that purchases participation interests in Oregon Bank Loans from the Bank.

3.      In Utah, the Bank originated Oregon Bank Loans to Oregon consumers as part of its multistate consumer lending program, which is subject to comprehensive oversight by the FDIC and the Utah Department of Financial Institutions.  The FDIC and the Utah Department of Financial Institutions require the Bank to implement extensive controls to ensure the safety and soundness of the Bank and compliance with applicable state and federal laws and regulations.  This comprehensive oversight extends to the Bank and the Bank's third-party service providers, including LoanMart.

4.      The DFR's imminent threat to void the Oregon Bank Loans and the Bank's interest in the collateral securing many of those loans are part of its effort to enforce the Oregon Consumer Finance Act ("CFA"), ORS 725 *et seq.*, against LoanMart, as a third-party service provider to the Bank for the Oregon Bank Loans, and against WFG, as the assignee of participation interests in select Oregon Bank Loans.  In relevant part, the DFR has asserted that LoanMart's marketing and servicing of the Oregon Bank Loans and WFG's participation interests in the Oregon Bank Loans, violate the CFA's usury provision, which prohibits a licensee from contracting for, charging, or

COMPLAINT – 3

172501875v15

receiving more than 36% interest on loans made in accordance with the CFA.  ORS 725.340.

5.     However, Section 27 of the FDIA, 12 U.S.C. § 1831d ("Section 27") and its implementing regulations, 12 C.F.R. § 331, preempt the DFR's threatened enforcement of the CFA against the Oregon Bank Loans, LoanMart, and WFG because federal law permits: (1) state-chartered, FDIC-insured banks to make loans to out-of-state borrowers with interest charges authorized by the bank's home state; (2) banks to sell or assign its loans to non-bank third parties; and (3) the assignees to enforce the loans' terms, including the interest charges.

6.     The Bank originated, and is the lender for, all Oregon Bank Loans.  The Bank is identified as the lender in each Oregon Bank Loan agreement.  Moreover, the Bank retains title to, and ownership of, the Oregon Bank Loans at all times (assigning only participation interests to WFG).  The Bank also remains the secured party for such loans, as noted on motor vehicle titles.

7.     The Bank contracts with LoanMart as a service provider to facilitate its lending operations in connection with Oregon borrowers, including marketing and servicing activities for the Oregon Bank Loans.

8.     Utah law authorizes the Bank to charge "any rate of interest" to its customers by written contract, Utah Code § 15-1-1(1), and Section 27 of the FDIA authorizes the Bank to charge the same agreed-upon interest rates on loans made to out-of-state borrowers, including the Oregon Bank Loans, 12 U.S.C. § 1831d; 12 C.F.R. § 331.

9.     Furthermore, 12 C.F.R. § 331 authorizes WFG—as an assignee of participation interests in the Oregon Bank Loans—to lawfully receive interest at the rate contained in the Oregon Bank Loan agreements.

10.     Thus, contrary to the DFR's contention, federal law permits LoanMart and WFG, in connection with the Bank and the Oregon Bank Loans, to engage in the activities at issue in the

COMPLAINT – 4

DFR's threatened enforcement action—facilitating loans made by an out-of-state, FDIC-insured bank and retaining participation interests in the bank loans, respectively—without regard to the CFA's 36% interest-rate restriction for loans made subject to the CFA.

11.     Nevertheless, the DFR has threatened to initiate enforcement proceedings against LoanMart and WFG for purported violations of the CFA's interest-rate cap.  Specifically, in an Order to Cease and Desist, Proposed Order to Assess Civil Penalties, and Proposed Order To Revoke License ("Notice Order"), dated July 25, 2023, the DFR erroneously relies on a novel "true lender" theory that appears nowhere in Oregon's statutes or regulations.  The DFR's unsupported theory asserts that LoanMart and WFG violated the CFA by "collecting, receiving, and retaining principal, interest, fees, and charges related to or in connection with" the Oregon Bank Loans because the interest rate on those loans exceeded 36%.  According to the Notice Order, LoanMart and WFG—not the Bank—are the "true lender" of the Oregon Bank Loans; LoanMart charged, contracted for, or received finance charges in excess of those permitted by the CFA; and WFG violated the CFA by collecting interest on the Oregon Bank Loans without having a CFA license.

12.     The threatened enforcement of the CFA on the Oregon Bank Loans, LoanMart, and WFG violates the United States Constitution, as well as federal and state banking laws and regulations.

13.     Accordingly, LoanMart and WFG bring this action against Defendants under 28 U.S.C. §§ 2201 and 2202 seeking, *inter alia*: (1) a declaration that the application of the CFA to the Oregon Bank Loans, and LoanMart and WFG's activities in connection with the Oregon Bank Loans, would violate the U.S. Constitution and federal law; and (2) injunctive relief preliminarily and permanently barring the DFR from enforcing the CFA against either LoanMart or WFG with respect to their support of the Bank's banking activities in connection with Oregon consumers,

COMPLAINT – 5

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

including their brokering, marketing, servicing, facilitating, and purchasing of participation interests in the Oregon Bank Loans.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over the claim asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1337, because the claim arises under the U.S. Constitution and the laws of the United States, including the 12 U.S.C. § 1831d, 12 U.S.C. § 1811 *et seq.*, and 12 C.F.R. § 331 and arise under an act of Congress regulating interstate commerce.

15.     This Court has personal jurisdiction over Defendants because they are residents of Oregon, and their principal place of business is in this District.

16.     This Court has the authority to issue Plaintiffs' requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65.

17.     Venue is proper in this Court pursuant to 18 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims advanced in this action occurred in this District.

## PARTIES

18.     LoanMart is a limited liability company organized and existing under the laws of California, with its principal place of business at 15400 Sherman Way, Suite 300, Van Nuys, California 91406.

19.     WFG is a wholly-owned subsidiary of LoanMart formed in December 2018 under the laws of the State of Delaware, with its principal place of business at 15400 Sherman Way, Suite 170, Van Nuys, California 91406.

20.     Andrew R. Stolfi is the Director of the DCBA.  The DCBA is an agency of the State of Oregon that oversees the DFR.  Andrew R. Stolfi issued the Notice Order at issue in this case

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

under color of state law, and the office he occupies is responsible for the Notice Order's enforcement.  Andrew R. Stolfi is sued in his official capacity only.

21.     TK Keen is the Administrator of the DFR.  The DFR is a Division of DCBA, which is an agency of the State of Oregon.  The DFR issued the Notice Order at issue in this case under color of state law, and the office TK Keen occupies is responsible for the Notice Order's enforcement.  TK Keen is sued in his official capacity only.

22.     Dorothy Bean is the Chief of Enforcement of the DFR.  The DFR is a Division of the DCBA, which is an agency of the State of Oregon.  Dorothy Bean issued the Notice Order at issue in this case under color of state law, and the office she occupies is responsible for the Notice Order's enforcement.  Dorothy Bean is sued in her official capacity only.

## BACKGROUND

### Federal Regulation of Banks and Interest Rate Authority

23.     FDIC-insured banks are subject to extensive federal regulation under the National Bank Act, 12 U.S.C. § 38 *et seq.*, and the FDIA, 12 U.S.C. § 1811 *et seq.*  That regulatory scheme is designed to ensure public confidence in the banking system and protect against potential bank failures that could trigger catastrophic financial repercussions for the government insurance fund. FDIC, RISK MANAGEMENT MANUAL OF EXAMINATION POLICIES § 1.1, 1.1-2 (Feb. 2021), https://www.fdic.gov/regulations/safety/manual/index.html.

24.     That regulatory regime is generally carried out by the Office of the Comptroller of Currency ("OCC"), which regulates national banks, 12 U.S.C. § 1, and the FDIC, which regulates state-chartered banks, 12 U.S.C. § 1891(a)(Tenth).

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

25.     Section 85 of the National Bank Act authorizes national banks to "charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the banks is located."  12 U.S.C. § 85.

26.     The National Bank Act also preempts the application of state laws that purport to limit the rate of interest a bank may charge on loans to borrowers outside the bank's home state. *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 313–14 (1978).

27.     Congress gave state-chartered, FDIC-insured banks the same interest rate and exportation authority in 1980, when it passed the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), Pub. L. No. 96-221, 94 Stat. 132 (1980), which added Section 27 to the FDIA.

28.     Congress's goal, in providing state banks this interest rate and exportation authority, was to mitigate the harm caused by soaring interest rates in the late 1970s, which harmed state banks because compliance with various "state usury laws . . . often made loans economically unfeasible."  *Greenwood Tr. Co. v. Mass.*, 971 F.2d 818, 826 (1st Cir. 1992); *see also* Donna C. Vandenbirk, *Usury ceilings and DIDMCA, Economic Perspectives*, 9 FED. RSRV. BANK CHI. 25 (1985) (discussing "more profitable spreads" available to national banks prior to rectification of this "inequity by extending to state banks and other federally insured institutions the same ceiling option available to national banks").  DIDMCA sought to alleviate the pressure on state banks by, among others, preempting state interest-rate limits and allowing state banks to charge appropriate interest rates.  126 Cong. Rec. 6900 (Mar. 27, 1980) (statement of Sen. Proxmire, discussing purpose of Title V of DIDMCA, including Section 27); *id.* at 6907 (statement of Sen. Bumpers, discussing intent to promote state banks' lending).

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

29.     As relevant here, Section 27 of the FDIA addresses the interest rates that state-chartered banks can charge to borrowers.  It provides:

> In order to prevent discrimination against State-chartered insured depository institutions . . . with respect to interest rates . . . such State bank[s] . . . may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section . . . charge on any loan . . . or other evidence of debt . . . interest . . . at the rate allowed by the laws of the State, territory, or district where the bank is located . . . .

12 U.S.C. § 1831d(a).

30.     For purposes of Section 27 of the FDIA, a bank is "located" in its home state (*i.e.*, "the State by which the bank is chartered").  12 C.F.R. §§ 331.2, 331.4(a).  Thus, like Section 85 of the National Bank Act, Section 27 permits state-chartered banks to export their home state's interest rates to other states.  12 U.S.C. § 1831d(a).

31.     The FDIC has clarified this authority by regulation.  Pursuant to its authority under 12 U.S.C. § 1891(a) (Tenth), the FDIC has explained that, under Section 27 of the FDIA and "[i]n order to prevent discrimination against State-chartered depository institutions," such banks "may, notwithstanding any State constitution or statute which is preempted by section 27 of the [FDIA], take, receive, reserve, and charge on any loan . . . the rate [of interest] allowed by the laws of the State . . . where the bank is located . . . ."  12 C.F.R. § 331.4(a).

32.     Further, under the FDIC's regulations, "[w]hether interest on a loan is permissible under section 27 of the [FDIA] is determined as of the date the loan was made.  Interest on a loan that is permissible under section 27 of the [FDIA] shall *not* be affected by . . . the sale, assignment, or other transfer of the loan, in whole or in part."  12 C.F.R. § 331.4(e) (emphasis added); FDIC Preamble to Federal Interest Rate Authority Rule, 85 Fed. Reg. 44,146, 44,149 (July 22, 2020) ("FDIC Preamble").

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

33.     Therefore, a loan that "was not usurious at inception, . . . cannot become usurious at a later time, such as upon assignment, and the assignee may lawfully charge interest at the rate contained in the transferred loan."  FDIC Preamble, *supra* at 44,149.

34.     12 C.F.R. § 331.4(e) codifies the longstanding "valid when made" doctrine, in which federal banking law recognizes that an assignee steps into the shoes of the assignor.  *See*, *e.g.*, *Gaither v. Farmers & Mechanics' Bank of Georgetown*, 26 U.S. 37, 43 (1828); FDIC Preamble, *supra* at 44,149 ("[T]he interest rate term of a loan must be determined when the loan is made, not when a particular interest payment is 'taken' or 'received.'").

35.     As a result, Section 27 of the FDIA preempts the application of state usury laws against assignees of a state-chartered bank's loans.

36.     Neither arranging for sales of participation interests in bank loans before the loans are made, nor a third party's servicing of loans, impacts a bank's interest rate and exportation authority under federal law, or the consequential preemptive effective of that authority on conflicting state laws.

37.     Section 27's interest rate and exportation authority is central to the stability and liquidity of the U.S. loan market because it allows banks to access secondary markets of non-bank investors, whose participation in the banking industry mitigates systemic banking risk.  *See* FDIC Preamble, *supra* at 44,155.

38.     Despite the foregoing, States have the option to opt-out of Section 27's interest rate exportation and preemption provisions for loans made in their respective jurisdictions.  *See* 12 U.S.C. § 1831d note.  To do so, a state must "adopt[] a law or certif[y] that the voters of such State have voted in favor of any provision, constitutional or otherwise, which states explicitly and by its terms that such State does not want" Section 27's interest rate and exportation authority to apply.

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

12 U.S.C. § 1831d note; *see also* 85 Fed. Reg. 44,146, 44,147 ("This opt-out authority is exercised by adopting a law, or certifying that the voters of the State have voted in favor of a provision, stating explicitly that the State does not want section 27 to apply with respect to loans made in such State.").

39.     Currently, only Iowa, Puerto Rico, and Colorado have opted-out of Section 27.  *See* 1980 Iowa Acts 1156 sec. 32; P.R. Laws Ann. tit. 10 sec. 998; Colo. Rev. Stat. § 5-13-106.

40.     Opt-out legislation has been introduced in D.C. and Rhode Island, and a ballot initiative has been proposed in Nevada.  *See* D.C. Council Bill 250609; R.I. HB 7941 & SB 22275; S-01-2024 (Nev. 2024) ("Preventing Predatory Payday and Other Loans Act").

41.     Oregon has never opted out of Section 27 of the FDIA.

### Bank Oversight of Third-Party Service Providers

42.     Both national and state-charted banks regularly rely on third-party service providers for material banking functions.  These arrangements offer significant benefits to banks, such as access to new technologies, human capital, new delivery channels, and additional products, services, and markets—including access to capital markets.  Interagency Guidance on Third Party Relationships: Risk Management at 37927, 88 Fed. Reg. 37,920 (June 9, 2023) ("Interagency Guidance").

43.     The OCC and FDIC have offered guidance to banks about their responsibility to oversee third-party service providers.  That guidance imposes on banks certain obligations with respect to (1) planning before engaging a third party; (2) conducting due diligence on the third party; (3) contract negotiation; (4) ongoing monitoring of the third party; and (5) termination of the third-party relationship, *see id*. at 37929.  The guidance also mandates that banks bear these responsibilities throughout the "life cycle" of the relationship.  *Id.*

COMPLAINT – 11

172501875v15

44.    For example, an appropriate due diligence process must "determine[e] whether the third party has the expertise, processes, and controls to enable the banking organization to remain in compliance with applicable . . . laws and regulations."  *Id.* at 37929.

45.    Similarly, the bank must ensure that the contract with the third-party provider "specif[ies] the obligations of the third party and the banking organization to comply with applicable laws and regulations . . . [and] provide[s] the banking organization with the right to monitor and be informed about the third party's compliance with applicable laws and regulations." *Id.* at 37932.

46.    Federal banking regulators routinely enforce these requirements and have imposed significant obligations on multiple banks for failures to properly manage third-party relationships. *See*, *e.g.*, *In re: Piermont Bank*, FDIC-23-0038b (Feb. 27, 2024); *In re: Sutton Bank*, FDIC 23-0110b (Feb. 1, 2024); *In re: Lineage Bank*, FDIC-23-0041b (Jan. 30, 2024); *In re: Cross River Bank*, FDIC-22-0040b (Mar. 8, 2023).

**Oregon Consumer Finance Act**

47.    Oregon, like other states, regulates loans and loan-related activities that take place within the state, subject to limitation by the U.S. Constitution and federal banking law.

48.    Among other things, the CFA prohibits anyone from "mak[ing] a consumer finance loan of $50,000 or less or act[ing] as an agent, broker or facilitator for a person that makes a consumer finance loan of $50,000 or less unless the person first obtains a license under this chapter."  ORS 725.045(1)(a).

49.    The CFA's implementing regulations define "loan" to mean "a loan that is *subject to the [CFA]*."  OAR 441-730-0010(13) (emphasis added).

COMPLAINT – 12

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

50.    The CFA prohibits a licensee from charging, "in connection with a consumer finance loan[,] . . . a finance charge that, when expressed as an annual percentage rate," exceeds 36%.  ORS 725.340(1)(a)(A).

51.    Critically, the CFA provides that "[n]*othing* in this chapter shall be construed or held to limit the rights, powers or privileges granted to *any person* by any law of this state or of the United States whereby the loaning of money or extending of credit is regulated, provided that such person is operating in compliance with the provisions of such law."  ORS 725.015 (emphasis added).

52.    The CFA also provides that it "does *not* affect loans made or payable in other jurisdictions and lawful where made or payable."  ORS 725.370 (emphasis added).

53.    These provisions make the CFA harmonious with Section 27's interest rate and exportation provision, because they expressly preclude the application of the CFA's 36% interest rate cap to national banks and out-of-state banks making loans to Oregon borrowers, as well as those banks' assignees and service providers.

54.    The Director of DCBS has the power to enforce the CFA, investigate "the loans and businesses of licensees," ORS 725.310, .312, remove or suspend licensee's officers, ORS 725.315, bring enforcement actions, ORS 725.410, and impose civil penalties to remedy violations of the CFA, ORS 725.910.

**LoanMart & WFG's Business Model**

55.    LoanMart is a third-party service provider to the Bank that conducts marketing and servicing activities on behalf of the Bank in connection with the Oregon Bank Loans.

56.    WFG is an affiliate of LoanMart that purchases participation interests in Oregon Bank Loans from the Bank.

COMPLAINT – 13

172501875v15

57.     Neither LoanMart nor WFG originate or fund any loans in the course of their business dealings with Oregon borrowers.

### The Bank Loan Program

58.     The Bank is an FDIC-insured, Utah-chartered bank, with branches exclusively in Utah, that offers a variety of financial services to consumers and businesses in multiple states, including motor-vehicle-secured loans to consumers.

59.     At all relevant times for this lawsuit, the Bank offered loans to borrowers residing in multiple states, including Oregon.  As permitted by federal law, Utah law, and Oregon law, the Oregon Bank Loans often charged interest rates exceeding 36%.  12 U.S.C. 1831d; Utah Code § 15-1-1(1); ORS 725.370.

60.     The Bank engaged LoanMart to market and service the Oregon Bank Loans in 2018, after conducting extensive due diligence into LoanMart's business as required by federal regulations.  *See* Interagency Guidance on Third Party Risk Management, *supra* at 37,927.  That diligence process lasted approximately three months and required LoanMart to provide the Bank with information about LoanMart's financials, hiring policies and processes, compliance policies and processes, information technology policies and processes, insurance, and litigation history, among other things.

61.     The terms of LoanMart and the Bank's relationship were memorialized in a Marking and Program Management Agreement ("Program Agreement").[1]

62.     Pursuant to the Program Agreement, LoanMart agreed to "act a service provider to Bank," make LoanMart's "platform to market loans through which borrowers can apply for loans

---

[1] Originally executed in 2018, the Program Agreement was amended and superseded multiple times—most recently in June 2023.  However, the terms of the 2018 and 2023 versions of the Program Agreement relevant to this dispute are substantially similar.

COMPLAINT – 14

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

made by banks that originate and issue loans through the platform" "available for such loans to be marketed on behalf of Bank," and "provide program management functions of such loans issued by Bank."

63.    Under the Program Agreement, the Bank retains control of, and has direct oversight over, all key aspects of the loan program.  For example, the Bank has sole discretion over program changes and the Bank approved all material aspects of the program, including all marketing materials and marketing channels, prescreened offers, credit policies, application forms, consumer disclosures, loan agreements, privacy policies and privacy notices, servicing forms, and all third-party vendors.  The Bank also actively oversees LoanMart by conducting compliance audits and accessing LoanMart's servicing system.

64.    Under the Program Agreement, the Bank approved consumer loan applications from its main office in Utah, where the Bank's credit policy was established, and LoanMart had no discretion to override the Bank's credit policy.

65.    Under the Program Agreement, the Bank, in Utah, originated each Oregon Bank Loan, and loan proceeds were disbursed from the Bank's account.  The Program Agreement also required that "each Loan Agreement and all other documents referring to the creditor for the Program shall identify Bank as the creditor," and the Bank's loan documents accordingly listed the Bank—and the Bank alone—as the "Lender."

66.    The Bank retains broad termination rights under the Program Agreement. Specifically, the Bank retains the right to terminate the Program Agreement if continued participation resulted in violation of the law, including any letter or directive of any kind by a regulatory authority.  The Bank also has other relatively broad termination rights.

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

67.     The Bank routinely exercised its control and oversight authority over the Oregon Bank Loan program by, among other activities, ongoing monitoring of LoanMart.  For example, the Bank required LoanMart to update its policies and procedures and implement a formal audit schedule for regulatory compliance, vendor management, BSA, and information technology.  The Bank also conducted annual reviews of LoanMart's policies, which LoanMart could not change in any material respect without the Bank's approval.

68.     The Bank also exerted significant control over LoanMart's marketing of the Oregon Bank Loans.  For example, the Bank refused to approve certain marketing images LoanMart had used in connection with a direct lending program, and it routinely required revisions to language used in marketing materials.

69.     LoanMart and Bank staff participated in bi-weekly calls regarding the program, in addition to a monthly compliance call, and communicated almost daily via email or the Bank's cloud-based platform about various aspects of the program.  Members of LoanMart and the Bank's accounting departments are also in constant communication about financial aspects of the Oregon Bank Loan program.

70.     To operate in a safe-and-sound manner and to replenish liquidity and capital, the Bank often sells or assigns interests in its loans, including Oregon Bank Loans, to third parties.

71.     To that end, the Bank entered into a Loan Participation Agreement[2] ("Participation Agreement") with WFG in 2018, whereby the Bank was permitted—but not required—to offer participation interests in eligible Oregon Bank Loans to WFG.

---

[2]  Originally executed in 2018, the Participation Agreement was amended and superseded multiple times—most recently in June 2023.  However, the terms of the 2018 and 2023 versions of the Participation Agreement relevant to this dispute are substantially similar.

172501875v15

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

72.     Although the Bank sold participation interests in certain Oregon Bank Loans to WFG, the Bank retains title to (*i.e.*, ownership of) all loans, including the Oregon Bank Loans, as well as the collateral as the secured party for many motor-vehicle-secured loans.  The Bank also retains an economic interest in the Oregon Bank Loans, even after selling participation interests to WFG.

### The DFR's Investigation of LoanMart

73.     In August 2019, the DFR issued LoanMart an Oregon Consumer Finance License. In connection with its license application, LoanMart explained the Bank's consumer lending program, including LoanMart's role as a third-party service provider for the Bank and the Oregon Bank Loans.

74.     The DFR did not question—much less object to—the Bank and LoanMart's business plan to offer Oregon Bank Loans to Oregon consumers.

75.     The DFR examined LoanMart in August 2020.  Later, the DFR issued LoanMart a Report of Examination, dated August 26, 2020 ("2020 ROE"), which stated that LoanMart was violating the Oregon Consumer Finance Act ("CFA") by brokering loans with interest rates exceeding 36%.

76.     The 2020 ROE also explained that "Oregon law expressly limits consumer finance licensees to 36 percent under ORS chapter 82.025 and ORS 725.340," and that "Oregon exercised its opt-out rights under Section 27 of FDI Act, 12 U.S.C. 1831d, as expressed in ORS 8.025 and ORS 725.340 when it eliminated the licensing exemption for financial institutions and expressly excluded consumer finance licensees from the 12 percent interest rate cap for loans of less than $50,000 and allowed them to charge the interest rate contained in ORS chapter 725."

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

77.    The 2020 ROE directed LoanMart to issue refunds to "all Oregon accounts for interest charged in excess of the maximum rate allowed by the state," and to "advise how this will be corrected going forward."

78.    On September 21, 2020, LoanMart responded to the 2020 ROE, reiterating LoanMart's business operations for the Bank and disputing the DFR's statement that Oregon had opted out of Section 27 of the FDIA and the DFR's application of ORS 725.340's interest rate cap to third-party service providers like LoanMart in connection with loans issued by out-of-state banks.

79.    On July 6, 2021, the DFR responded to LoanMart's letter, repeating its position that ORS 725.340's interest rate cap applies to LoanMart, even though the "Bank is the lender and that pursuant to ORS 708A.255, the rate of interest that [the] Bank may contract for and receive, is generally speaking, not subject to limitation."

80.    On July 27, 2021, LoanMart responded to the DFR's July 6, 2021, letter, again explaining that LoanMart is not subject to ORS 725.340 because "LoanMart does not charge, contract for, or receive" finance charges because the "[]Bank is the lender (as [DFR] acknowledge[s]) and is the owner of any loans made to Oregon consumers."

81.    The DFR did not respond to LoanMart's July 27, 2021, letter.

82.    Instead, the DFR renewed LoanMart's license in December 2021.

83.    The DFR examined LoanMart a second time in August 2022, and issued a Report of Examination ("2022 ROE"), again claiming that LoanMart was subject to, and violating, ORS 725.340's 36% interest cap.  The 2022 ROE repeated the DFR's position that Oregon had opted out of Section 27 of the FDIA and warned that "[t]hese violations may be reviewed by the Oregon

COMPLAINT – 18

Troutman Pepper Hamilton Sanders LLP
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

Department of Consumer and Business Services' Division of Financial Regulation for possible enforcement action."

84.    LoanMart responded to the 2022 ROE on October 13, 2022, reasserting that LoanMart, "as a service provider to [the ]Bank," is not subject to ORS 725.340's interest rate cap, and that Oregon had not opted out of Section 27 of the FDIA.

85.    On October 25, 2022, the DFR emailed LoanMart, writing it wants to "clarify" that it had not "concluded that [the ]Bank was the lender with respect to the Bank Loans" and that "[a]t this time, it is not necessary for [the DFR] to make a determination as to the lender of the Bank Loans." The email failed to address LoanMart's response to the 2022 ROE because LoanMart's position relied on the fact that the Bank had originated the Oregon Bank Loans.

86.    The DFR renewed LoanMart's license in November.

87.    Without warning, the DFR issued to LoanMart and WFG an Order To Cease And Desist, Proposed Order To Assess Civil Penalties, Proposed Order To Revoke License, And Notice Of Right To Administrative Hearing, dated July 25, 2023 ("Notice Order").

88.    The Notice Order asserts that LoanMart is subject to ORS 725.340's interest rate cap, and violated the cap by "charging, contracting for, or receiving finance charges that, when expressed as an annual percentage rate, exceeded the statutory limits."

89.    For the first time, the DFR raised a "true lender" theory, alleging that LoanMart and WFG were the true lender of the Oregon Bank Loans, and that as a licensee, LoanMart violated the rate provisions of the CFA. This true-lender theory appears nowhere in any Oregon statute, regulation, case, or guidance.

90.    The Notice Order also asserts that "[b]ecause WFG was not licensed under ORS Chapter 725 at the time the Oregon Loans were made," WFG was "prohibited from collecting,

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

receiving, or retaining any principal, interest, fee or charge related to or in connection with and of the Oregon Loans."

91.    The Notice Order asserts that the Oregon Bank Loans are "void under ORS 725.045(1)(b)" as a result of these purported violations.

92.    The Notice Order orders LoanMart and WFG "to cease and desist from engaging in violation of the Oregon Consumer Finance Act and herby gives notice that the Director proposes to assess civil penalties" against LoanMart and WFG, and "revoke [LoanMart's] Oregon consumer finance license."  The DFR seeks to impose a $660,000 civil penalty on LoanMart, a $132,000 civil penalty on WFG, and a combined $5,796,610 civil penalty—"or such other amount as [DFR] may determine to be equal to the interest Respondents received in connection with the" Oregon Bank Loans—on both LoanMart and WFG.

93.    Finally, the Notice Order informed LoanMart and WFG of their right to "a formal contested case hearing" pursuant to ORS Chapter 183, and its 20-day deadline to request such a hearing.

94.    LoanMart and WFG would suffer substantial economic injury because WFG's entire interests in the Oregon Bank Loans would be void, and LoanMart would be deprived of income from its servicing activities for the Bank.

95.    Upon receiving the Notice Order, the Bank and LoanMart conferred, and the Bank stopped offering and originating new Oregon Bank Loans on August 1, 2023.

96.    On August 11, 2023, LoanMart and WFG requested a contested case hearing on all matters set forth in the Notice Order.

97.    Despite the Notice Order, the DFR renewed LoanMart's license in December 2023.

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

98.    LoanMart and WFG responded to the Notice Order through a series of written submissions to, and meetings with, the DFR to negotiate a potential settlement.  The DFR has rejected the federal supremacy and preemption positions raised by Plaintiffs, and the parties have not reached an agreement.  Without an agreement, the DFR has stated that it will refer the Notice Order to the Office of Administrative Hearings within a week to commence contested case proceedings to address the alleged violations of Oregon law.

99.    The Notice Order, the unsuccessful discussions between the parties, and the DFR's recent statement that it is prepared to refer the matter to the Office of Administrative Hearings within a matter of days constitute a direct threat of imminent formal enforcement.

## CLAIM FOR RELIEF
## PREEMPTION

100.    The allegations contained in the preceding paragraphs of the Complaint are incorporated by reference as if set forth fully herein.

101.    The U.S. Constitution makes federal law "the supreme Law of the Land," U.S. CONST. art. VI, cl. 2, and any state law that is contrary to or conflicts with federal law is preempted and thus invalid under the Supremacy Clause.

102.    Congress has the power to preempt state law.  Preemption may be express, or, in the absence of an express provision, state law may be preempted where Congress intends to "occupy the field" or where state law conflicts with federal law, by, for example, impeding the purpose and objectives of the federal law.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citation omitted).

103.    Section 27 of the FDIA expressly provides that an FDIC-insured, state-chartered bank may make loans "at the rate allowed by the laws of the State, territory, or district where the bank is located" and expressly preempts any conflicting state constitution or statute.  12 U.S.C.

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

§ 1831d(a).  12 C.F.R. § 331.4(e) extends Section 27's interest rate exportation authority and the preemptive effect thereof to a state-chartered bank's assignees.

104.    The Bank is an FDIC-insured, Utah-chartered bank.  Accordingly, under Section 27 of the FDIA, the Bank can make loans to Oregon consumers with interest-rate charges authorized by Utah law without regard to Oregon's interest rate cap.  *See* 12 U.S.C. § 1831d; ORS 725.370.

105.    The Bank's loans are valid when made under Utah law.  *See* Utah Code § 15-1-1(1).  Therefore, because the Bank's interest rate and exportation authority "shall not be affected by . . . the sale, assignment, or other transfer of the loan" to a different entity, 12 C.F.R. § 331.4(e), any subsequent transfer of a participation interest in Oregon Bank Loans to WFG does not affect the validity of the loans' interest rates, FDIC Preamble, *supra* at 44,149.

106.    The Bank's interest rate and exportation authority—which extends to its assignees and service providers—applies "notwithstanding any State constitution or statute, which is hereby preempted for purposes of this section."  12 U.S.C. § 1831d(a).

107.    Oregon has not "adopt[ed] a law, or certif[ied]" that its voters "have voted in favor of any provision" stating explicitly that the State does not want section 27 to apply with respect to loans made in" Oregon, and, therefore, Oregon has not opted-out from Section 27's interest rate and exportation authority provisions.  *See* 12 U.S.C. § 1831d note.

108.    To the contrary, Oregon state law *embraces* Section 27 of the FDIA by expressly providing that the CFA's terms, including its 36% interest rate cap, ORS 725.340(1)(a)(A), "do[] *not* affect loans made or payable in other jurisdictions and lawful where made or payable," ORS 725.370 (emphasis added), and *"[n]othing* in [the CFA] shall be construed or held to limit the rights, powers, or privileges granted to *any person* by any law of [Oregon] or of the United States

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

whereby the loaning of money or extending of credit is regulated," ORS 725.015 (emphasis added).

109.    LoanMart is a third-party service provider for the Bank with respect to the Oregon Bank Loans.  LoanMart does not originate, issue, or fund any Oregon Bank Loans, and therefore, it does not "charge, contract for[, or] receive in connection with[] consumer finance loan[s]" any finance charges.  ORS 725.340(1)(a).  Accordingly, ORS 725.340's interest rate cap does not apply to LoanMart.

110.    WFG is an assignee of participation interests in select Oregon Bank Loans.  Pursuant to 12 C.F.R. § 331.4(e), WFG is authorized to receive participation interests in Oregon Bank Loans, even if the interest rate on the loans exceeds 36%.  Accordingly, ORS 725.340's interest rate cap does not apply to WFG.

111.    Section 27 of the FDIA and its implementing regulations preempt the application of the CFA to LoanMart with respect to LoanMart's marketing and servicing of the Oregon Bank Loans.

112.    Section 27 of the FDIA and its implementing regulations also preempt the application of the CFA to WFG with respect to its receipt of interest on the Oregon Bank Loans via participation interests.

113.    Accordingly, the DFR's efforts to void the Oregon Bank Loans and the Bank's interest in the collateral securing many of the Oregon Bank Loans, and impose civil penalties by enforcing the CFA's 36% interest rate cap against LoanMart and WFG is preempted by the Supremacy Clause of the U.S. Constitution and applicable federal banking law and regulations.

COMPLAINT – 23

**Troutman Pepper Hamilton Sanders LLP**
100 SW Main Street, Suite 1000
Portland, Oregon 97204
Phone: +1.503.290.2322

172501875v15

## PRAYER FOR RELIEF

WHEREFORE, LoanMart and WFG respectfully request that this Court grant the following relief:

a.      A declaration that the application of the CFA to the Oregon Bank Loans, and LoanMart and WFG's activities in connection with the Oregon Bank Loans, would violate the U.S. Constitution and federal law;

b.      An order enjoining the DFR, preliminarily and permanently, from enforcing the CFA against either LoanMart or WFG with respect to their support of the Bank's banking activities pertaining to Oregon consumers, including their brokering, marketing, servicing, facilitating, and purchasing of participation interests in the Oregon Bank Loans; and

c.      Such other and further relief as the Court may deem just and proper.

Respectfully submitted this 12th day of September, 2024.

/s/ Thomas N. Abbott
Thomas N. Abbott (OSB 193043)
TROUTMAN PEPPER HAMILTON SANDERS LLP
100 S.W. Main St, Suite 1000
Portland, OR 97204
(503) 290-2322
Thomas.Abbott@troutman.com

James Kim (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
(212) 704-6000
(212) 704-6288 (facsimile)
James.Kim@troutman.com

Jason D. Evans (*pro hac vice* forthcoming)
Anais M. Jaccard (*pro hac vice* forthcoming)
Daniel J. Prichard (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
301 S. College St., 33rd Floor
Charlotte, NC 28202

COMPLAINT – 24

172501875v15

(704) 916-1502
Jason.Evans@troutman.com
Anais.Jaccard@troutman.com
Daniel.Prichard@troutman.com

Caleb N. Rosenberg (*pro hac vice* forthcoming)
TROUTMAN PEPPER HAMILTON SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 274-1946
(202) 274-2994 (facsimile)
Caleb.Rosenberg@troutman.com

*Counsel for Plaintiffs Wheels Financial Group, LLC and WFG Purchaser, LLC*

COMPLAINT – 25

172501875v15